IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

ARKANSAS VOTER INTEGRITY
INITIATIVE, INC., CONRAD REYNOLDS,
and DONNIE SCROGGINS                                                    PLAINTIFFS

vs.                              Case No. 4:23-cv-479-JM

JOHN THURSTON, in his official capacity
as ARKANSAS SECRETARY OF STATE,
the ARKANSAS STATE BOARD OF
ELECTION COMMISSIONERS, in its
official capacity, and ELECTION SYSTEMS
AND SOFTWARE, LLC                                                      DEFENDANTS

<u>**STATE DEFENDANTS' RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR INJUNCTION**</u>

Come Separate Defendants John Thurston, in his official capacity as Arkansas Secretary

of State, and the Arkansas State Board of Election Commissioners, "in its official capacity," (col-

lectively, the "State Defendants") and for their Response in Opposition to Plaintiffs' Motion for

Injunction, state:

**INTRODUCTION**

In the Amended Complaint, Plaintiffs purport to assert five claims under federal and Ar-

kansas law. Although cast as five claims, the Plaintiffs' amended complaint boils down to a single

allegation: that Arkansas's electronic voting machines used for federal and state elections do not

comply with the Help America Vote Act of 2002 ("HAVA") and thus do not comply with Arkansas

law that fully adopts federal law. Plaintiffs also allege an illegal exaction against all defendants,

and a violation of the Arkansas Deceptive Trade Practices Act and fraud by Election Systems and

Software, LLC (ESS). Finally, Plaintiffs seek entry of an injunction based on the allegations re-

garding their interpretation of HAVA and the illegal-exaction claim.

1

Plaintiffs' Motion for Injunction is without merit and, in fact, lacks legal argument. Instead, it is comprised of nothing more than repeated conclusory statements unsupported by fact or law; *ipse dixit* at its finest. This is shown by their failure to acknowledge the fact that the voting machines used in Arkansas are tested and certified by the U.S. Election Assistance Commission (EAC), which Congress created in HAVA and vested with the responsibility of setting voting-system standards and of providing for the testing and certification of voting systems. *See* 52 U.S.C. §§ 20901–21145. In other words, EAC has the ultimate say on the standards that voting machines must satisfy to comply with HAVA.

Because the EAC certified Arkansas's machines as complying with HAVA, there is little likelihood that Plaintiffs will succeed on the merits of their claims. Too, they have failed to show a threat of irreparable harm, and instead, enjoining the use of the machines would be of much greater harm to the defendants and have dire implications on the election process across the country. The public has a strong interest in continuing to use voting machines that comply with all aspects of the law.

For the reasons more fully set forth below, Plaintiffs' Motion for Injunction should be denied.

## BACKGROUND

I.  **Statutory and Regulatory Background**

A. *The Help America Vote Act of 2002*

Enacted in 2002, the HAVA, 52 U.S.C. §§ 20901–21145, made numerous important reforms to the nation's voting processes, including, as relevant here, the creation of the EAC to "serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections[.]" 52 U.S.C. § 20922.

HAVA assigns to the EAC several important roles to improve the administration of federal elections. Key among these responsibilities is the promulgation of the Voluntary Voting System Guidelines (VVSG or Guidelines), which are a set of voluntary "specifications and requirements against which voting systems can be tested to determine if the systems meet required standards." U.S. Election Assistance Comm'n, *Voluntary Voting System Guidelines*.[1]

As their name indicates, the VVSG are fully voluntary, and no state or local jurisdiction need adopt or apply them, either fully or partially. Nor is any manufacturer of voting systems federally required to build to VVSG specifications. 52 U.S.C. § 20929; Declaration of Mark A. Robbins (Robbins Decl.) ¶ 9, attached hereto as Exhibit 1.[2] However, states and localities may choose to adopt the VVSG, making them mandatory in their jurisdiction.[3] Additionally, in order to facilitate and encourage the use of the VVSG, HAVA further requires the EAC to create a program "for the testing, certification, decertification, and recertification of voting system hardware" against the standards established by the VVSG. *Id.* § 20971(a)(1). The EAC has complied with this directive by establishing and administering its Testing and Certification Program

---

[1] https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.0_Volume_1.PDF, https://perma.cc/EJ93-PP56.

[2] In June 2022, a plaintiff filed an action in the United States District Court for the Eastern District of Missouri (Case No. 4:22-cv-00682) against the EAC, the EAC Commissioners, and the Missouri Secretary of State. The complaint alleged that certificates of accreditation were not updated for the voting system test laboratories (VSTLs) and therefore, the VSTLs were not in compliance for the 2020 election. The complaint alleged that because of this, the electronic voting systems in use in Missouri for the 2020 election were invalid and therefore the results must be declared invalid. The Declaration of Mark A. Robbins and attached exhibits were submitted in support of the EAC's Motion to Dismiss for Lack of Subject Matter Jurisdiction. The declaration and exhibits were made publicly available by EAC to better inform the public on the EAC's Testing and Certification operations. These materials are equally informative in the instant case.

[3] Information about states' use of the VVSG, https://www.eac.gov/sites/default/files/TestingCertification/State_Requirements_for_Certification09042020.pdf, https://perma.cc/5WCM-SK3Z.

(Program or TCP). *See generally* EAC Testing and Certification Program. [4] Like the VVSG them-

selves, participation in the EAC's Testing and Certification Program is wholly voluntary. How-

ever, for all entities that elect to participate the requirements of the Program are mandatory. VSTL

Program Manual § 1.4; VSTC Program Manual § 1.4.

      B.   *The EAC Testing and Certification Program*

In general, the EAC's Testing and Certification Program has two key components. Each

component is governed by its own manual that implements corresponding aspects of the Program.

First, the Voting System Test Laboratory Program Manual (VSTL Program Manual) sets proce-

dures for independent laboratories to become accredited from the EAC to test voting systems

against the requirements of the VVSG. *See generally* VSTL Program Manual (Exhibit B to Rob-

bins Decl.). Laboratories that obtain accreditation are called Voting System Test Laboratories

(VSTLs). Second, the Voting System Testing and Certification Program Manual (VSTC Program

Manual) sets procedures for manufacturers of voting systems and VSTLs to test and certify voting

systems to VVSG standards. *See generally* VSTC Program Manual (Exhibit C to Robbins Decl.).

Through the procedures set forth in these Manuals, manufacturers of voting systems—in

conjunction with accredited VSTLs and the EAC—are able to test new systems, modified systems,

or components thereof for compliance with VVSG standards. Manufacturers are also able to obtain

certifications of compliance with the applicable version of the VVSG from the EAC. As set forth

below (and in more detail in the relevant program manuals), EAC accreditations apply to specific

voting systems that have been tested against the VVSG (i.e., not a voting-system manufacturer

generally). VSTC Program Manual § 5.11.

---

[4] https://www.eac.gov/voting-equipment/testing-and-certification-program,
https://www.eac.gov/sites/default/files/TestingCertification/EAC_Testing_and_Certifica-
tion_Program.pdf.

1.   <u>The VSTL Program Manual: Certification of Testing Laboratories</u>

By statutory design, the EAC does not test voting systems for compliance with the VVSG. Rather, HAVA directed the National Institute of Standards and Technology (NIST) to "conduct an evaluation of independent, non-Federal laboratories" and "submit to the [EAC] a list of those laboratories [that NIST] proposes to be accredited to carry out the testing, certification, decertification, and recertification" of voting systems for compliance with the VVSG. 52 U.S.C. § 20971(b)(1); *see also* VSTL Program Manual § 2.3.[5]

However, "[w]hile NIST's recommendation serves as a reliable indication of potential technical competency," the "EAC is the sole authority for Voting System Test Laboratory Accreditation." VSTL Program Manual § 3.4. Thus, after the EAC receives the recommendations from NIST, the EAC conducts further review of the recommended laboratories to address non-technical issues such as conflict-of-interest policies, organizational structure, and recordkeeping protocols, and then votes on the final accreditation of qualified laboratories. 52 U.S.C. § 20971(b)(2)(A); *see also* U.S. Election Assistance Comm'n, *Frequently Asked Questions*.[6]

An EAC accreditation of a VSTL is expressly limited to the version of the VVSG that the VSTL is, at the time of accreditation, authorized to test against. VSTL Program Manual § 3.7.1. When the VVSG are updated—as they are periodically, including most recently through the adoption of VVSG 2.0 on February 21, 2021, Robbins Decl. ¶ 5—a VSTL must obtain a new

---

[5] The NIST program that assesses and proposes qualifying laboratories to the EAC is known as the National Voluntary Laboratory Accreditation Program (NVLAP), and "[a]s a condition of accreditation, all VSTLs must hold a valid accreditation from [NVLAP.]" VSTL Program Manual § 2.4.
[6] https://www.eac.gov/voting-equipment/frequently-asked-questions, https://perma.cc/X62A-LHRT.

accreditation to be authorized to test voting systems against the new VVSG. VSTL Program Manual § 3.7.1.[7]

        2.  <u>The VSTC Program Manual: Testing and Certification of Voting Systems to the VVSG</u>

Once a VSTL has been accredited by the EAC, it is authorized to evaluate voting systems and software against the VVSG to determine whether the voting system or voting software meets the Guidelines' standards for functionality, accessibility, and security capabilities. However, the VSTL does not itself certify VVSG compliance; rather, after completion of testing, the VSTL submits a recommendation for certification to the EAC, which makes the final determination of whether a given voting system or software program should be certified. VSTC Program Manual §§ 3.1-3.2, 3.2.3. The VSTC Program Manual sets forth, in detail, the policies and procedures that apply to both (1) manufacturers submitting or updating their voting systems or components to a VSTL for testing, and (2) VSTLs in conducting authorized testing against the VVSG and making recommendations to the EAC as to whether a particular voting system should be certified as VVSG-compliant. *See generally* VSTC Program Manual.

Once a particular voting system has been certified as VVSG-compliant by the EAC, it retains its certification indefinitely, unless it undergoes a qualifying modification requiring that it be retested and recertified or is required to be decertified under the terms of the Program. *See id*. §§ 3.3-3.3.4, 3.5-3.5.5 (explaining when certification is required under the terms of the Program,

---

[7] The VSTL Program Manual further sets forth in detail, among other things, the policies and procedures of the EAC's Compliance Management Program—through which the EAC conducts continual oversight of accredited VSTLs to ensure their ongoing compliance with all substantive and procedural requirements of the Testing and Certification Program. *See* VSTL Program Manual §§ 4.1-4.10.3. When a VSTL is found to be in noncompliance with Program requirements, the VSTL Program Manual further sets forth specific procedures by which a VSTL may correct the identified issue(s), and by which the EAC may, if necessary and warranted under the terms of the Program, revoke the VSTL's accreditation. *See id*. Chapter 5.

including, for example, when a change to a previously certified system is not "de minimis"); *id.* Chapter 7 (setting forth triggers and procedures for the decertification of previously certified systems that no longer meet applicable VVSG standards); *see generally* VVSG Lifecycle Policy (Exhibit A to Robbins Decl.).

3. <u>Cooperative Federalism Principles in Use of EAC Certifications by States and Localities.</u>

As explained above, there is no federal requirement that states or localities use VVSG-compliant voting systems to conduct their elections. However, states and localities may voluntarily set such requirements by law or policy. Consistent with the "cooperative federalism" principles underlying the EAC's Testing and Certification Program, when a state or locality chooses to avail itself of the VVSG, the Program, or both, the state or locality retains several important roles to play in the selection and certification of voting systems. Specifically, as provided by the VSTC Program Manual, state and local officials are responsible for "testing voting systems to ensure the system will support the specific requirements of each individual State," VSTC Program Manual § 1.6.1.2; "performing acceptance testing to ensure that the equipment delivered is identical to the equipment certified at the federal and state levels [and] is fully operational," *id.* § 1.6.1.4; and "confirm[ing] [that] equipment is operating properly and is unmodified from its certified state," *id.* § 1.6.1.5; *see also id.* § 3.2.3 (explaining the limitation of an EAC-issued voting system certification).

C. *Arkansas's Requirements for the Certification of Voting Systems*

In Arkansas, voting-machine companies apply to the State Board of Election Commissioners (SBEC) for consideration. Ark. Code Ann. §§ 7-5-503, -606(b). The SBEC examines the marking, tabulating device, or both, and submits a report to the Secretary of State of its accuracy, efficiency, and capacity. *Id.* The Secretary selects the voting machines to be used.

Arkansas participates in the VVSG.[8] It requires voting-machine testing by a federally accredited laboratory in accordance with the VSTL Program Manual and requires federal certification by the EAC. Specifically, voting machines must comply with the provisions set forth in Ark. Code Ann. § 7-5-504, including that it be "[q]ualified by an authorized federal agency or national testing and standards laboratory which is acceptable to the Secretary of State," "[a]pproved by the [SBEC]," and "selected by the Secretary of State." Ark. Code Ann. § 7-5-504(21). Further, any marking device and electronic vote tabulating device must fulfill the requirements of HAVA. Ark. Code Ann. § 7-5-606(e).

Relevant to this case, HAVA Section 301 mandates that all types of voting systems provide these functional requirements:

- permit the voter to verify (in a **private and independent manner**) the vote selected by the voter on the ballot before the ballot is cast and counted
- provide the voter with the opportunity (**in a private and independent manner**) to change the ballot or correct any error before the ballot is cast and counted
- notify the voter if he or she has selected more than one candidate for a single office, inform the voter of the effect of casting multiple votes for a single office, and provide the voter an opportunity to correct the ballot before it is cast and counted
- be accessible for individuals with disabilities in a manner that provides the same opportunity for access and participation (**including privacy and independence**) as for other voters
- provide alternative language accessibility pursuant to Section 203 of the Voting Rights Act

---

[8] *See* Information about Arkansas's use of the VVSG, https://www.eac.gov/sites/default/files/TestingCertification/State_Requirements_for_Certification09042020.pdf, https://perma.cc/5WCM-SK3Z.

*See* VVSG 1.0 § 1.5.2 Types of Voting Systems (emphases added); *see also* § 21081(a)(1)(A)(i–ii). Further, "the mandatory voting system standards mandated in HAVA Section 301 relate to the interaction between the voter and the voting system":

> Voting system standards
>
> (a) Requirements. Each voting system used in an election for federal office shall meet the following requirements:
>> (1) In general.
>>> (A) Except as provided in subparagraph (B) [regarding paper ballot voting systems], the voting system (including any lever voting system, optical scanning voting system, or direct recording electronic system) shall –
>>>> (i) permit the voter to verify (**in a private and independent manner**) the votes selected by the voter on the ballot before the ballot is cast and counted;
>>>> (ii) provide the voter with the opportunity (**in a private and independent manner**) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error); and
>>>> (iii) If the voter selects votes for more than one candidate for a single office—
>>>> I. Notify the voter that the voter has selected more than one candidate for a single office on the ballot;
>>>> II. Notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and
>>>> III. Provide the voter with the opportunity to correct the ballot before the ballot is cast and counted.
>>> (B) A state or jurisdiction that uses a paper ballot voting system, a punch card voting system, or a central count voting system (including mail-in absentee ballots and mail-in ballots), may meet the requirements of subparagraph (A)(iii) by—
>>>> (i) Establishing a voter education program specific to that voting system that notifies each voter of the effect of casting multiple votes for an office; and
>>>> (ii) Providing the voter with instructions on how to correct the ballot before it is cast and counted (including instructions on how to correct the error through the issuance of a replacement ballot if the

> voter was otherwise unable to change the ballot or
> correct any error).
> (C) The voting system shall ensure that any notification re-
> quired under this paragraph preserves the privacy of the
> voter and the confidentiality of the ballot.

*See* VVSG 1.0 § 3.1 Usability Requirements (emphases added); *see also* § 21081(a)(1)(A)(i–ii).

Arkansas has a concomitant statute reflecting this HAVA provision:

> Machine specifications
>
> No make of voting machine shall be approved for use unless it is so
> constructed that:
> (1) It will ensure **secrecy** to the voter in the act of voting;
> (6) It shall permit the voter to verify **in a private and independent
> manner** the votes selected by the voter on the ballot before the ballot
> is cast;
> (7) It shall provide the voter with the opportunity **in a private and
> independent manner** to change the ballot or correct any error be-
> fore the ballot is cast; [and]
> (18) It shall be provided with a screen, hood, or partition which shall
> allow the voter to vote a **secret** ballot; . . .

Ark. Code Ann. § 7-5-504(1), (6), (7), (18) (emphases added).

D. *Voting Machines Used in Arkansas*

The voting machines used in Arkansas are manufactured by ESS: the ExpressVote Ballot

Marking Device (EVS) and component part DS200 Scanner and Tabulator ("ESS machines").[9]

These machines underwent EAC VVSF 1.0 Certification Testing and were issued a Certificate of

Conformance by the EAC. *See* Test Report for EAC VVSF 1.0 Certification Testing; *see also*

Certificate of Conformance.[10] The ESS's machines were independently examined by the SBEC,

which certified the equipment as complying with the requirements of Arkansas law and as eligible

---

[9] Information regarding the ExpressVote system and DS200, https://www.essvote.com/products/expressvote/, https://www.essvote.com/products/ds200/.
[10] https://www.eac.gov/sites/default/files/voting_system/files/ESS%20EVS6110%20Test%20Report-01.pdf; https://www.eac.gov/sites/default/files/voting_system/files/EVS6100Cert_Scope_%2528FINAL%2529.pdf

to be selected for use in the State of Arkansas. *See* Certification of ES&S Voting Equipment, attached hereto as Exhibit 2; *see also* EAC Certificate of Conformance to ESS, attached hereto as Exhibit 3. The Secretary of State selected the ESS machines, which is used in all seventy-five (75) counties in Arkansas. The step-by-step procedure for voting on equipment is as follows:

1. Insert the ballot card received after checking in, into the card slot of the machine.
2. The ballot will display on the screen.
3. The voter will mark her votes by touching anywhere inside the box around her choice, which will change color.
4. After all choices are marked, touch the "Review Selections" button.
5. Review the selections on the vote review summary screen.
6. To make a change, touch the contest and the screen will redisplay it, then touch the name or contest to deselect your original choice and then select the new choice.
7. Then, touch the "Return to Summary" button.
8. After the voter has reviewed and verified her choices and is satisfied, she is to complete the following steps:
   - Touch "Print Ballot"
   - A confirmation screen will display that the voter is about to print her selections. The display instructs to select "Print Card," or to change a selection, touch "Previous."
   - If the voter is satisfied, she selects "Print Card."
9. After touching print, the voter again reviews the selections as printed on the ballot.
   - The printed card will show the candidates selected for each contest in written form as well as the corresponding barcodes for each race.
   - If a change is necessary at that point, she may contact a poll worker.
10. If the voter is satisfied, she will insert her ballot into the DS200 tabulator. The voter's choices are scanned and recorded, and the printer card is deposited into a secure bin. The DS200 screen will display a "thank you for voting" message.

*See* ExpressVote video demonstration.[11] Steps 5, 7, and 9 afford the voter the opportunities for private and independent review before casting the ballot. Whether using a hand-marked paper ballot or machine-marked paper ballot, the DS200 works in a similar manner. *See* Election Systems & Software, *How are Ballots Read?*[12]

---

[11] https://www.essvote.com/products/expressvote/.
[12] https://www.essvote.com/blog/our-technology/how-are-ballots-read/.

Prior to the election, "the election officials enter their election information in a secure, hardened application that in turn generates the layout for either a hand-marked or machine-marked paper ballot and creates the database that resides on the tabulator used to record and count the votes for both ballot types." *Id*. "Barcodes are simply a group of lines and spaces that represent specific characters—in the case of both hand-marked and machine-marked paper ballots, these lines translate to numbers that are grid coordinates and those grid coordinates correspond to a candidate name in a database." *Id*. The database then reveals to the tabulation machine, for instance, that "fifteen down, nine across" corresponds to "Candidate Smith." At that point, the tabulation machine records a vote for the name "Candidate Smith." *Id.*

The accuracy of the voting process and tabulators is confirmed by election officials during pre-election tests of every tabulation machine and in post-election audits of randomly selected tabulation machines. In 2019, the 92nd General Assembly passed legislation to authorize the SBEC to conduct a post-election audit of the general-election results. *See* Ark. Code Ann. §§ 7-4-101(f)(12)–(13), § 7-4-121, § 7-5-702. The Act also provides that the SBEC would conduct a pilot program following the 2020 General Election to gain experience in conducting post-election audits and to utilize this experience to develop a more detailed plan for auditing future elections. *See* Post-Election Audit Report 2020 Pilot Program (2020 General Election).[13]

The methodology of the post-election audit was as follows:

> The purpose of this audit is to assess the efficacy of the vote tabulation equipment in service in the State of Arkansas. This assessment was conducted by selecting certain batches of ballots tabulated by the voting equipment and hand counting the actual ballots which constitute the Voter Verified Paper Audit Trail (VVPAT) for Arkansas's voting equipment. This hand count was then compared to the electronic count, as recorded on the official vote totals that were produced by the tabulator, are signed by the poll workers who

---

[13] https://static.ark.org/eeuploads/elections/2020_Post_Election_Audit_Report_-_Final.pdf.

produced the respective report, and which serves as the legal election results for those ballots.

Pursuant to the requirements of Act 888 of 2019, the SBEC randomly selected the counties to be audited in its December 2nd meeting. As provided in section 5 of the Act, the SBEC selected five counties, including one county from each Congressional District and one county with a population of more than 100,000 people. Once selected, counties were notified by letter and SBEC staff worked with the counties to schedule the audit in each county.

For each audited county, Staff randomly selected between the sealed boxes containing voted ballots. For each box that was selected, the SBEC staff broke ballot box seals and hand counted the paper ballots and looked specifically at the votes cast for presidential electors. The hand counted totals where then compared with the totals on the official results tape for that box of ballots. These findings were then documented on a report which is signed under oath by the auditor. Those signed reports are included in this report.

*Id.* The counties were White, Pope, Lincoln, Faulkner, and Madison. The audit revealed the voting equipment used and audited rendered a faithful and accurate count of the ballots that were submitted to the system for counting. Based on these findings, the SBEC concluded that ESS's system accurately tabulated the election results for the 2020 General Election in the State of Arkansas. *Id.*

Following the 2022 General Election, the SBEC randomly selected fifteen (15) counties to perform its election audit. The counties were Ashley, Bradley, Chicot, Clay, Cleburne, Crawford, Crittenden, Franklin, Newton, Perry, Pike, Pulaski, Searcy, Sebastian, and Stone. To date all but Pulaski County have been audited. The SBEC has hand counted 32,483 ballots out of 113,926 ballots cast in the selected counties, which represents a combined average of 30.3% of ballots cast in those counties. The audit has found the tabulator count is 100% accurate.[14]

---

[14] Because Pulaski County remains to be audited, a final report is not available to enclose with this Response. Of note, in Crittenden County, one additional paper ballot was located in Crittenden County. Upon review, it is believed that the errant ballot was placed in the emergency bin, as was appropriate, but then inadvertently mixed into the ballot box during either the process of moving the equipment or retrieving the ballots. Based on known information, it is not believed the errant ballot was processed through the tabulator. As to the single additional ballot, the number of ballots located in the ballot box matched the number of voters processed in that poll indicating that the

II.       **Procedural Background**

On December 19, 2022, Plaintiff Arkansas Voter Integrity Initiative, Inc. filed this action in Pulaski County Circuit Court. *See generally* Compl., ECF No. 2. The original Complaint sought a declaratory judgment that the voting machines currently approved by the Arkansas Secretary of State and SBEC fail to comply with Ark. Code Ann. § 7-5-504. *Id*. It also sought an injunction to prevent the use of voting machines. *Id*.

State Defendants and Separate Defendant ESS timely answered, denying Plaintiff's allegations, and raising applicable affirmative defenses. *See generally* Answer of ESS, ECF No. 4; Answer of State Defendants, ECF No. 5.

On March 14, 2023, Pulaski County Circuit Judge Tim Fox entered an order dismissing ESS without prejudice. *See* Order (March 14, 2023). The Order states:

> On this day came on for consideration separate defendant Election Systems and Software, LLC's request in paragraph thirty-two (32) of the Answer to Complaint for Declaratory Judgment, Motion for Injunction, and Motion to Expedite, filed February 2, 2023, that the complaint be dismissed against separate defendant. The court finds that this matter should be and is hereby dismissed without prejudice as to separate defendant Election Systems and Software, LLC as the complaint fails to state a viable claim against the separate defendant that sounds either in contract or in tort.

*Id*. On April 13, 2023, the circuit court set this matter for hearing on May 30, 2023.

An Amended Complaint was filed on May 4, 2023, naming two additional plaintiffs: Conrad Reynolds and Donnie Scroggins. *See* Amended Compl., ECF No. 6. The Amended Complaint includes the original request for declaratory judgment interpreting Ark. Code Ann. § 7-5-504 and adds four new causes of action: (1) Declaratory Judgment Pertaining to the Help America Vote

---

one ballot was not scanned through the tabulator and thus omitted from the final count. Due to the errant ballot, SBEC hand counted all the ballots cast in Crittenden County. Whether human or mechanical error, this constitutes an error rate of 0.00003079.

Act of 2002 ("HAVA"); (2) Illegal Exaction; (3) Violation of the Arkansas Deceptive Trade Prac-

tices Act ("ADTPA"); and (4) Fraud. *Id.* at p. 6–14. The claims of violation of the ADTPA and

fraud are only directed to ESS. *Id.* ¶¶ 64, 72. This seems to be an attempt to get ESS back in the

case after its dismissal.

The Amended Complaint and its allegations are derivative of Plaintiffs' request for the

Court to enter a declaratory judgment interpreting HAVA and finding that the voting machines

used in Arkansas violate HAVA and concomitant Arkansas law. Plaintiffs do not reference the

multiple opportunities for the voter to review and make any necessary changes to her ballot

throughout the voting process. Instead, the Amended Complaint skips to the use of the DS200. *Id.*

¶ 42. Plaintiffs acknowledge the printed ballot from the machine shows the name of the candidates

in English and a barcode. They complain that "while the voter's selections are printed out [on] the

bottom of the ballot, this is not the information read, processed, or tabulated by the DS200." *Id.* ¶

43. "[I]nstead, it is the bar code at the top of the ballot that is read, processed, and tabulated by the

DS200." *Id.* ¶ 44. Therefore, Plaintiffs allege that because a voter cannot read the barcode to con-

firm it in fact corresponds to the selected candidate, the voter is not able "to verify in a private and

independent manner the votes selected by the voter on the ballot before the ballot is cast." *Id.* ¶¶

45-46. Based on this, they contend ESS machines do not comply with HAVA. *Id.* Plaintiffs request

the court declare these machines do not comply with HAVA and enjoin the use of the voting ma-

chines in all future elections unless and until the machines comply with federal law. *Id.* ¶¶ 47-49.

Based on the alleged violation of HAVA, Plaintiffs make a claim for illegal exaction under

Arkansas law, arguing that the funds spent to purchase these machines were illegally spent. *Id.* ¶¶

51–61. Absent from Plaintiffs' allegations is the reality that by and large the voting machines used

in Arkansas are purchased using federal HAVA grant funds.

Continuing, Plaintiffs raise allegations against only ESS of violations of the ADTPA and fraud, which again, are dependent upon the Court's interpretation of HAVA.

On May 11, 2023, Plaintiffs filed a motion for injunction and supporting brief, requesting that the Court find that the ESS machines do not comply with HAVA and Arkansas law and seeking to enjoin the use of these machines in future elections in Arkansas and enjoin the state from spending any money on the purchase or maintenance of these voting machines. *See* Mot. for Inj. ECF No. 7 [hereinafter, "PI Mot."]. The only alleged basis for the Motion for Injunction is that the machines do not comply with HAVA and, in turn, Arkansas law, which allegedly constitutes an illegal exaction. *See* Brief. Inj., ECF No. 8 [hereinafter, "PI Brief"].

ESS filed a motion to dismiss and supporting brief on May 17, 2023, regarding the alleged illegal exaction, violation of the ADTPA, and fraud. *See* ECF No. 9, 10. Plaintiffs filed their response with supporting brief on May 21, 2023. *See* ECF No. 12, 13.

State Defendants removed this case to federal court on May 24, 2023. *See generally* ECF No. 1. The Notice of Filing Notice of Removal was filed in the state court action the following day. All Defendants sought an extension of time to respond to Plaintiffs' Motion for Injunction (ECF No. 18, 22), which were granted, setting the due date by June 8, 2023. *See* ECF No. 19, 23. On June 5, 2023, Plaintiffs filed a motion for remand with supporting brief. *See* ECF No. 24, 25.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs bear the burden of establishing the propriety of a preliminary injunction, and they must make "a clear showing" they have carried that burden. *Id.* at 22; *see Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). When considering a motion for preliminary injunction, courts weigh four factors: "(1) the threat of irreparable harm

to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

"The burden of proving that a preliminary injunction should be issued rests entirely with the movant." *Goff v. Harper*, 60 F.3d 519-21 (8th Cir. 1995). Here, Plaintiffs' have failed to meet their burden. In fact, Plaintiffs' motion does not even discuss the four factors that a court must consider before ruling on a motion for preliminary injunction, let alone demonstrate that these factors favor such an "extraordinary" form of relief. *Winter*, 555 U.S. at 24. Nor can they because each of those factors weighs against injunctive relief in this case.

I.      **<u>Plaintiffs Have Not Shown a Probability of Success on the Merits of Their Claims</u>**

     A.   *<u>ExpressVote and DS200 comply with HAVA and Arkansas law.</u>*

Plaintiffs' entire case rests on the interpretation of the HAVA provision requiring that the voting machine:

> (i) permit the voter to verify (**in a private and independent manner**) the votes selected by the voter on the ballot **before the ballot is cast and counted**;
> (ii) provide the voter with the opportunity (**in a private and independent manner**) to change the ballot or correct any error **before the ballot is cast and counted** (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error);

*See* VVSG 1.0 § 3.1 Usability Requirements (emphases added); *see also* § 21081(a)(1)(A)(i–ii). As Plaintiffs acknowledge, Arkansas law mirrors HAVA. *See* Ark. Code Ann. § 7-5-504. The term "cast" means "the final action a voter takes in selecting contest options and irrevocably confirming

their intent to vote as selected." *See* EAC'S Glossary of Election Terms.[15] A "cast ballot" is "a ballot [that] has been deposited by the voter in the ballot box, mailbox, drop box or electronically submitted for tabulation." *Id*. To "cast your ballot" (or cast your vote) is "[t]he act of a voter to place their completed paper ballot in a ballot box, to confirm and record their choices on a touch screen voting device at a voting location, to place a completed ballot in the mail or a drop box or to send a completed ballot through electronic transmission to an elections office. Once a ballot is cast, it usually cannot be changed." *Id*. A "counted ballot" is a "ballot that has been processed and whose votes are included in the candidates and measures vote total." *Id*.

Plaintiffs' recitation of the voting procedure in Arkansas does not include the multiple opportunities voters have to verify in a *private and independent manner* the votes selected by the voter and make any necessary corrections *before the ballot is cast and counted*. As outlined above, before the voter "casts" her ballot by inserting it into the DS200, she can review her selections as many times as necessary on the ExpressVote display and make any desired changes, finalize her selections on the Summary display, and again when the ballot is printed. Again, as listed above, Steps 5, 7, and 9 afford the voter the opportunities for private and independent review before casting the ballot. This shows the ESS machines are compliant with HAVA and Arkansas law based on the federal standards as mandated by the EAC.

For the Plaintiffs' theory to prevail, this Court must conclude that all voting equipment that utilizes a method of encoding a voter's choice for later mechanical reference, as is done with the bar codes in the ExpressVote System, can never satisfy the requirements of HAVA. Such a standard would invalidate hand-marked ballots, which are read by the tabulation machine that operates by comparing the voters marks to timing marks, as well as direct-recording electronic voting

---

[15] https://www.eac.gov/sites/default/files/glossary_files/Glossary_of_Election_Terms_EAC.pdf.

machines, which encode the voter's selections on a computer. The errancy of this reading is betrayed by the fact that direct-recording electronic voting machines are explicitly contemplated in HAVA. There is no functional difference between the encoding of the voter's selection in barcodes to be read by the tabulation machine and encoding the selection on a computer, which is explicitly authorized in HAVA. In all three voting methods, a printed readable artifact of the voter's selection is present creating a sperate voter verified paper audit trail.

Furthermore, the post-election audit results demonstrate that the bar codes do in fact correspond to the selected candidate. Plaintiffs have no argument or evidence to the contrary. The barcode is for the machine to read. It is not a valid basis to enjoin the use of legally compliant machines.

B. _There is no illegal exaction because the machines are compliant with HAVA and Arkansas law._

"There are two types of illegal-exaction cases under Arkansas law—illegal-tax cases and public-funds cases." *Brown v. Mortg. Elec. Registration Sys., Inc.*, 738 F.3d 926, 932 (8th Cir. 2013) (citing *Brewer v. Carter*, 365 Ark. 531, 231 S.W.3d 707, 709 (2006). "A public-funds case is one in which the taxes are being misapplied or illegally spent, and an illegal-tax case involves a tax that is itself illegal." *Id*. "Before a public-funds type of illegal exaction will be allowed to proceed, there must be facts showing that monies generated from tax dollars or arising from taxation are being misapplied or illegally spent." *Bowerman v. Takeda Pharms. U.S.A.*, 2014 Ark. 388, at 5, 442 S.W.3d 839, 843 (citing *Dockery v. Morgan,* 2011 Ark. 94, 380 S.W.3d 377). Standing to bring an illegal exaction suit hinges on the plaintiff being a citizen and having contributed to the state treasury. *Id.*, 2014 Ark. 388, at 5, 442 S.W.3d at 842-43. Arkansas's voting machines are

mostly paid for using federal HAVA grant funds.[16] Plaintiffs have not plead facts to establish the source of funds used for the purchase of the machines in question.

Instead, Plaintiffs argue that because the voting machines are non-compliant, any monies spent by the state to purchase or maintain the machines constitutes an illegal exaction. Therefore, Plaintiffs acknowledge that the court must determine whether the voting machines comply with HAVA and Arkansas law in order for their illegal exaction claim to succeed. *See* PI Brief 7.

As demonstrated above, voting machines used in Arkansas are required to be "(A) qualified by an authorized federal agency or national testing and standards laboratory which is acceptable to the Secretary of State; (B) approved by the [SBEC]; and (C) selected by the Secretary of State." Ark. Code Ann. § 7-5-504(21). And must fulfill the requirements of HAVA. Ark. Code Ann. § 7-5-606(e). Plaintiffs have failed to offer any evidence to dispute the fact these machines comply with both HAVA and Arkansas law. And, because they comply, there is no viable argument that the state is misappropriating funds, thereby dooming Plaintiffs' illegal exaction claim. In short, Plaintiffs cannot meet their burden of proving success on the merits. Their motion for injunctive relief should be denied.

## II.   Plaintiffs Will Not be Irreparably Harmed in the Absence of a Preliminary Injunction

"Regardless of the strength of its claim[s] on the merits, a movant for a preliminary injunction should show a threat of irreparable harm." *See Gen Motors Corp.*, 563 F.3d at 318 (citing *Dataphase*, 640 F.2d at 113). To do so, a plaintiff must show "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). The absence of such harm "is an

---

[16] https://www.eac.gov/sites/default/files/paymentgrants/narrative2020/AR_20ES_Program_Narrative.pdf.

independently sufficient ground upon which to deny a preliminary injunction." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

Plaintiffs' motion fails to state an injury or any basis for irreparable harm. The motion and brief lack any support for this element and contain only a minimal recitation of some caselaw regarding illegal exaction. It is their position that the Court must determine whether the voting machines comply with HAVA and Arkansas law before the basis of a claim for illegal exaction could exist. *See* PI Brief 7. As demonstrated above, voting machines used in Arkansas are required to be "(A) qualified by an authorized federal agency or national testing and standards laboratory which is acceptable to the Secretary of State; (B) approved by the [SBEC]; and (C) selected by the Secretary of State." Ark. Code Ann. § 7-5-504(21). And must fulfill the requirements of the HAVA. Ark. Code Ann. § 7-5-606(e). Plaintiffs have failed to offer any evidence to dispute the fact these machines comply with both HAVA and Arkansas law. There being no proof of non-compliance, Plaintiffs have failed to show any legal basis for their claim for illegal exaction, and therefore, have failed to establish irreparable harm.

### III.     The Balance of the Equities and the Public Interest Do Not Support a Preliminary Injunction

Even if Plaintiffs had shown a probability of success on the merits or irreparable harm— which they did not—the remaining *Dataphase* factors would strongly weigh against their requested preliminary injunction. Plaintiffs fail to address these factors, but their motion for injunction nevertheless seeks an extraordinary and expedited relief that would dismantle the election process in Arkansas. If Plaintiffs argument is accepted, there will be no voting machine certified by EAC that is compliant and would require a return to hand-counted paper ballots. Further, it would impact the testing, certification, and entire foundation of the use of voting machines

certified by EAC across the country. It is not in the public interest for the Court to issue an extraordinary order, which could risk the entire state of Arkansas being reverted back to hand-counted paper ballots, which is Plaintiffs' goal.[17] *See*, *e.g.*, *Walen v. Burgum*, No. 1:22-cv-31, 2022 WL 1688746, at *7 (D.N.D. May 26, 2022) (recognizing that "federal court orders impacting elections may themselves result in uncertainty and hardship for voters, candidates, and election officials"); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944-45 (2018) (per curiam) (holding that "a due regard for the public interest in orderly elections supported the District Court's discretionary decision to deny a preliminary injunction").

## CONCLUSION

For the above-stated reasons, the Court should deny Plaintiffs' Motion for Injunction.


Dated: June 8, 2023                    Respectfully submitted,

                                       TIM GRIFFIN
                                       Attorney General

                                       *Jordan Broyles*
                                       Jordan Broyles, Ark Bar No. 2015156
                                       Senior Assistant Attorney General
                                       Arkansas Attorney General's Office
                                       323 Center Street, Suite 200
                                       Little Rock, AR 72201
                                       Phone: (501) 682-9482
                                       Fax:    (501) 682-2591
                                       Email:  jordan.broyles@arkansasag.gov

                                       *Attorneys for Separate Defendants John Thurston,*
                                       *in his official capacity as Arkansas Secretary of*
                                       *State, and the Arkansas State Board of Election*
                                       *Commissioners, "in its official capacity"*

---

[17] *See* AVII website, https://arkansasvii.org/.

## CERTIFICATE OF SERVICE

I, Jordan Broyles, hereby certify that on June 8, 2023, I electronically filed the foregoing pleading on behalf of Separate Defendants John Thurston, in his official capacity as Arkansas Secretary of State, and the "Arkansas State Board of Election Commissioners, in its official capacity" using the CM/ECF system, which will send notifications to all attorneys of record.

*Jordan Broyles*
Jordan Broyles